UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

HILLSIDE METRO ASSOCIATES, LLC,

                Plaintiff,               MEMORANDUM
                                            AND ORDER

            - against -
                                            10-CV-1772 (JG) (SMG)

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,

                Defendant.

-------------------------------------------------------------x

A P P E A R A N C E S :

      KASLING, HEMPHILL, DOLEZAL & ATWELL, LLP
             700 Lavaca, Suite 1000
             Austin, TX 78701
      By:   Roy K. Kasling
                *- and -*
      DEWEY PEGNO & KRAMARSKY LLP
             777 Third Avenue
             New York, NY 10017
      By:   Adam Michael Smith
            Dewy Pegno & Kramarsky LLP
            *Attorneys for Plaintiff*

      MORGAN, LEWIS & BOCKIUS LLP
             101 Park Avenue
             New York, NY 10178
      By:   Heather Leigh Hopkins
            *Attorneys for Defendants*

      CULLEN AND DYKMAN LLP
             100 Quentin Roosevelt Boulevard
             Garden City, NY 11530
      By:   Cynthia Ann Augello
            Justin F. Capuano
            *Attorneys for Intervenor FDIC*

JOHN GLEESON, United States District Judge:

Hillside Metro Associates, LLC ("Hillside") brings this breach of contract action against JPMorgan Chase Bank, National Association ("Chase"). Hillside seeks to enforce a lease it originally entered into with Washington Mutual Bank ("WaMu"). After the lease was executed, WaMu was declared insolvent. The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for WaMu and assumed all assets and liabilities of the failed bank. Hillside alleges that the FDIC subsequently assigned the lease at issue to Chase, rendering Chase liable for the obligations that originally bound WaMu under the lease. Chase, which denies it is liable under the lease, has refused to perform those obligations. Accordingly, Hillside contends that Chase has breached, abandoned, and/or repudiated the lease, and it seeks damages in an amount upward of $2 million.

Hillside moves for summary judgment pursuant to Fed. R. Civ. P. 56. It argues that Chase is liable under the lease as a matter of law. Chase opposes Hillside's motion and cross-moves for summary judgment, seeking dismissal of Hillside's claim. The FDIC, which has intervened in the action, moves for dismissal of Hillside's claim under Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, under Rule 12(c) for failure to state a claim. Oral argument was held on June 23, 2011. For the reasons stated below, the motions are denied.

BACKGROUND

A.      *Factual and Procedural Background*

On April 30, 2008, Hillside and WaMu entered into a lease ("lease" or "Hillside lease") pertaining to a piece of real property located at 216-20 Hillside Avenue in Queens, New York ("property" or "Hillside property"). (Pl.'s 56.1 Stmt. ¶¶ 1-2, May 2, 2011, ECF No. 24; Lease, Decl. Robert Corroon, Ex. A, May 2, 2011, ECF No. 24-3; 24-4.) Hillside agreed to lease

the property to WaMu for a period of ten years, with options for renewal and for early termination. (Lease §§ 1.01 35.01; 38.01.) At the time the lease was executed, Hillside and WaMu intended that a bank branch would be constructed on the property, and that WaMu would use the bank branch in its banking operations. (Pl.'s 56.1 Stmt. ¶ 3.) A building was already located on the property, and Hillside undertook certain obligations for repairing the structure. (Lease § 7.01.) The lease granted WaMu permission to install in the building automated teller machines and a drive-through window, and attached to the lease was a "Concept Plan" depicting a fully constructed, operational bank branch. (*Id.* § 6.01(b)(i), Ex. A.) Although the record contains scant information about the condition of the structure on September 25, 2008, as of that date construction was not yet completed and WaMu was not conducting any banking business on the property. (Decl. Robert Corroon ¶ 7, May 2, 2011, ECF No. 24-2.) At oral argument on June 23, 2011, counsel for Hillside represented that his client had been engaged in renovating the structure on September 25, 2008, and that its transformation into a bank branch was seventy or eighty percent complete.

On September 25, 2008, the Office of Thrift Supervision ("OTS") declared WaMu insolvent and appointed the FDIC to serve as WaMu's receiver pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73, § 212(a), 103 Stat. 183, 222-25, codified at 12 U.S.C. § 1821(c).[1] (Pl.'s 56.1 Stmt. ¶ 6; Office of Thrift Supervision Order No. 2008-36, Decl. Peter Barter Ex. A, May 24, 2011, ECF No. 29-9.) Accordingly, as of that date, all of WaMu's assets and liabilities, including the lease, were taken over by the FDIC. (Pl.'s 56.1 Stmt. ¶ 6; Decl. Peter Barter ¶ 4, May 24, 2011, ECF No. 29-8.) Also on September 25, 2008, Chase and the FDIC executed a Purchase and Assumption

---

[1]        Section 1821(c) provides for appointment by the OTS of the FDIC as receiver for failed depository institutions.

Agreement (the "PAA") respecting the assets and liabilities held by WaMu at the time it entered

receivership. (PAA, Decl. R. Kemp Kassling Ex. A, May 2, 2011, ECF No. 24-9; 24-10.)

Pursuant to § 3.1 of the PAA, "all right, title, and interest of the Receiver in and to all of

[WaMu's] assets" were transferred to Chase with certain specified exceptions. Among those

assets specifically not transferred were "leased Bank Premises." (PAA §§ 3.1, 3.5, Schedule

3.5.)

> "Bank Premises" are defined in the PAA as:
>
> the banking houses, drive-in banking facilities, and teller facilities
> (staffed or automated) together with appurtenant parking, storage
> and service facilities and structures connecting remote facilities to
> banking houses, and land on which the foregoing are located, that
> are owned or leased by the Failed Bank and are occupied by the
> Failed Bank as of Bank Closing.

(PAA art. I.) Although Chase explicitly did not assume any leases for Bank Premises under the

PAA, the PAA granted Chase an option to assume such leases within 90 days of September 25,

2008. (PAA § 4.6(a), Schedule 3.5.) The PAA required Chase to provide the FDIC with notice

within the 90-day option period of its election either to accept or not to accept assignment of any

Bank Premises lease. (PAA § 4.6(a).) Any lease that was not assumed by Chase within the 90

days would remain within the control of the FDIC as receiver. Pursuant to 12 U.S.C. § 1821(e),

the FDIC, within a reasonable period after its appointment as receiver for WaMu, could

repudiate any lease to which WaMu was a party as long as it determined, within its discretion,

that that such lease was burdensome, and that its repudiation would promote the orderly

administration of WaMu's affairs.

Apparently treating the Hillside lease as one for Bank Premises subject to § 4.6 of

the PAA, Chase informed the FDIC in December 2008 that it did not wish to assume the lease.

(Decl. Gregg Vogel ¶ 9, May 24, 2011, ECF No. 31-4; Decl. Robert C. Schoppe ¶ 7, May 24,

2011, ECF No. 31-7.)  Chase also sent a letter dated January 2, 2009 to Hillside, stating that Chase had the option to assume or not to assume the Hillside lease and had decided not to assume it.  (JPMorgan Chase Bank Letter Re: 216-20 Hillside Avenue, Decl. Robert Corroon Ex. B, May 2, 2011, ECF No. 24-5.)  By letter dated April 19, 2009, the FDIC informed Hillside that it had decided to disaffirm the lease.  (FDIC Letter Re: FIN #10015, Decl. Robert C. Schoppe Ex. C, May 24, 2011, ECF No. 31-10.)  The letter stated that Hillside would be entitled under the lease and under 12 U.S.C. § 1821(e)(4) to all rent accruing before the date of the letter, and that the FDIC's obligations under the lease on behalf of WaMu would terminate as of that date.  (*Id*.) On March 9, 2010, Hillside sent a letter to Chase in which it argued that Chase had automatically assumed the lease under the PAA.  (Hillside Letter Re: Net Lease, Decl. Robert Corroon Ex. C, May 2, 2011, ECF No. 24-6.)  Hillside declared Chase in default of the lease and demanded that Chase remedy the purported default within ten days.  (*Id*.)

The following month, on April 21, 2010, Hillside commenced this action against Chase, seeking damages for breach, abandonment and/or repudiation of the lease plus attorneys' fees.  On July 7, 2010, the FDIC moved to intervene pursuant to Fed. R. Civ. P. 24 as the real party in interest; the unopposed motion was granted on July 12, 2010.  On May 2, 2011, Hillside moved for summary judgment on its claim, pursuant to Fed. R. Civ. P. 56.  On May 24, 2011, the FDIC cross-moved for dismissal of Hillside's claim pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings.  Also on May 24, 2011, Chase cross-moved for summary judgment.  Oral argument was held on June 23, 2011.  For the reasons stated below, the motions are denied.

B.    *The Parties' Positions*

Hillside argues that Chase automatically assumed the lease by virtue of § 3.1 of the PAA.  According to Hillside, the lease did not fall within any of the exceptions to that provision's wholesale assumption of assets.  Specifically, Hillside contends that the leased property did not constitute Bank Premises as defined in the PAA because the structure located on the Hillside property was not yet a banking house, drive-in banking facility or teller facility, and WaMu did not yet occupy any such facilities on the property.  Accordingly, Hillside concludes, Chase never had an option to accept or reject the lease under § 4.6.  Instead, it automatically took WaMu's place as lessee and became liable for its obligations under the lease on September 25, 2008.

In response, Chase points out that Hillside's argument relies on an interpretation of the PAA, to which it is not a party or a third-party beneficiary.  Chase contends that Hillside cannot rely on the PAA to establish privity with Chase and therefore lacks standing to assert its claim.  And, even if Hillside does have standing, Chase argues, its claim fails on the merits, because the lease is for Bank Premises under the PAA, and Chase timely exercised its option not to assume the lease.  Hillside conceded at oral argument that if the lease is for Bank Premises, Chase cannot be held liable, and Chase correspondingly conceded that if the lease is not for Bank Premises, it was automatically assumed by Chase pursuant to § 3.1, rendering Chase liable for all obligations under the lease.

The FDIC, in its motion to dismiss, joins Chase's argument that Hillside does not have standing to advance its interpretation of the PAA, and therefore agrees that Hillside's claim must be dismissed for lack of jurisdiction.  The FDIC further argues that Hillside's claim must be dismissed because, even if the lease was assigned to Chase by the PAA, the assignment would be

void and unenforceable against Chase under federal banking regulations that limit the purposes for which national banks may purchase or hold real property. I address each of these arguments below.

C.      *Decisions in Other Courts*

A number of other federal district courts have considered arguments very similar to those advanced here with respect to the same PAA. In each case, the plaintiff, like Hillside, had leased property to WaMu on which WaMu intended to construct and operate a bank branch. While the structures on the properties were at varying stages of completion – including some vacant lots on which construction had not yet begun – none of the leased properties bore a fully completed, operational bank branch. In each case, the plaintiff alleged that the leased premises were not Bank Premises and that the lease had been automatically assumed by Chase pursuant to the PAA. In each case, Chase and the FDIC argued that the plaintiff was without standing to rely on the PAA.

Several federal district courts have agreed with Chase and the FDIC that a plaintiff in Hillside's position has no standing to assert its claims because it is not a third-party beneficiary to the PAA and so cannot not rely on the PAA to establish privity. *See* Court Order Re Def.'s Mot. Dismiss at 5, *Firestone Brookshire HE, LLC v. JPMorgan Chase Bank*, No. CV 10-9155-VBF (FMOx) (C.D. Cal. Mar. 18, 2011)[2] ("Firestone is not an intended third-party beneficiary of the PAA and thus cannot enforce Firestone's interpretation of the PAA's covenants."); Order Granting Mot. Dismiss at 12, *GECCMC 2005-C1 Plummer Street Office LP v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 2:10-cv-01615-JHN-SHx (C.D. Cal. July 7, 2010)[3] ("Plaintiff is neither a party to the PAA nor an intended beneficiary of the agreement between

_____

[2]      A copy of this order can be found on the docket sheet in this case. Def.'s Request Judicial Notice Ex. B, May 24, 2011, ECF No. 32-3 (hereinafter "*Firestone*").

[3]      Def.'s Request Judicial Notice Ex. D, May 24, 2011, ECF No. 32-5 (hereinafter "*GECCMC*").

JPMC and the FDIC.  As such, Plaintiff has no legal right to enforce its own interpretation of the PAA in order to create privity with Defendant."); Order at 9-11, *Interface Kanner, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 10-14068-CIV-GRAHAM/LYNCH (S.D. Fla. Mar. 18, 2011)[4] (holding that plaintiff was not a third-party beneficiary of the PAA and could not "rely on its own interpretation of the PAA" to establish privity of estate, and "therefore has no standing to enforce its provisions"); *Eastbourne Arlington One, LP v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 4:10-CV-948-Y, 2011 WL 3165683, at *4 (N.D. Tex. July 27, 2011) (holding that plaintiff lacked standing because it was not a third-party beneficiary of the PAA and could not establish privity by relying on a contract to which it was not a party).  These courts rejected plaintiffs' attempts to rely on the PAA to establish standing as "circular."  *Interface Kanner* at 11; *see also Firestone* at 6 (plaintiff's argument "puts the cart before the horse").  At least one court, in *GECCMC*, held that the plaintiff could not establish standing because "finding that Plaintiff has standing to sue JPMC is tantamount to deciding the case on the merits, since both issues turn on whether the leases constitute 'Bank Premises' subject to Section 4.6 of the PAA."  *GECCMC* at 12.

   In other courts, plaintiffs in Hillside's position have fared better.  *See* Order, *Cent. Sw. Tex. Dev., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. A-09-CA-819-SS (W.D. Tex. Aug. 6, 2011)[5]; *290 at 71, LLC. v. JPMorgan Chase Bank, Nat'l Ass'n*, No. A-09-CA-576-SS, 2009 WL 3784347 (W.D. Tex. Nov. 9, 2009); Memorandum Opinion and Order, *Excel Willowbrook, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. H-09-2988 (S.D. Tex. July 11,

---

[4]  Def.'s Request Judicial Notice Ex. C, May 24, 2011, ECF No. 32-4 (hereinafter "*Interface Kanner*").

[5]  Pl.'s Notice Supplemental Auth. Ex. A, Aug. 9, 2011, ECF No. 50-1 (hereinafter "*Cent. Sw. Tex. Dev.*").

2011)[6]; Order, *SR Partners Highway 26, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:10-CV-438-O (N.D. Tex. Sept. 2, 2011)[7]; *SR Partners Hulen, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:10-CV-437-B, 2011 WL 2923971, at *4 (N.D. Tex. July 21, 2011). In at least five cases, courts have agreed that a party like Hillside may establish privity of estate by relying on an assignment to which it is neither a party nor a third-party beneficiary. *See, e.g.*, *SR Partners Hulen*, 2011 WL 2923971, at *4 (rejecting "the somewhat novel proposition that this Court may not even review the terms of the PAA on Plaintiff's behalf because Plaintiff is neither a signatory or nor a third party beneficiary to the PAA and thus lacks standing to interpret or enforce the PAA"). These courts dismissed "[t]he vehement arguments of the FDIC and Chase that Plaintiff's case 'fails at the threshold'" as "a catch-22 that would keep Plaintiffs from asserting its [sic] rights under the Lease against the new lessee even if a valid assignment of the Lease did occur." *290 at 71*, 2009 WL 3784347, at *4; *see also SR Partners Hulen*, 2011 WL 2923971, at *6. They also concluded that the standing of a plaintiff like Hillside depends on whether Chase in fact assumed the lease under the PAA, *see Cent. Sw. Tex. Dev.* at 8 ("[T]o determine whether Chase is in privity with Plaintiff it is essential to interpret the PAA and understand what happened to the Lease under its unambiguous terms."); *SR Partners Highway 26* at 12 ("[T]he Court must interpret the terms of the PAA in order to determine whether Plaintiff has standing . . . ."). But, unlike the court in *GECCMC*, which ended its inquiry there, these courts "began by interpreting the PAA to determine whether plaintiff was in privity of estate with Chase." *Id*. at 10 (citing *290 at 71*, 2009 WL 3784347, at *4). They all concluded that the leases before them were not for Bank Premises, that the PAA transferred the leases to

---

   [6]    Pl.'s Notice Supplemental Auth. Ex. A, July 14, 2011, ECF No. 47-2 (hereinafter "*Excel Willowbrook*").
   [7]    Pl.'s Notice Supplemental Auth. Ex. A, Sept. 6, 2011, ECF No. 51-1 (hereinafter "*SR Partners Highway 26*").

Chase, and that the plaintiffs therefore had standing to assert their breach of lease claims against Chase. *See SR Partners Hulen*, 2011 WL 2923971, at *8 ("[T]he lease in the case constitutes 'Other Real Estate' under the PAA, Plaintiff is in privity of estate with Chase, Plaintiff has standing to bring the present suit, and the Court has jurisdiction over the dispute."); *Excel Willowbrook* at 11 ("[T]he PAA fully substituted Chase for the FDIC as the plaintiffs' tenant under the leases, thereby putting the plaintiffs in privity with Chase. Consequently, the plaintiffs have standing to rely on the PAA's unambiguous terms to sue Chase for allegedly breaching the leases.").

Finally, in *Skillman-Eastridge, Ltd. v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:09-CV-01988-M, 2011 WL 4528391 (N.D. Tex. Sept. 29, 2011), the court agreed that the plaintiff could rely on an interpretation of the PAA to establish standing. Although it stated that standing "is quite different from who should prevail on the merits," it too found that the plaintiff's standing depended on whether its interpretation of the PAA was correct. *Id*. at *4 ("[F]or Skillman to have standing to sue JPMC it must show that JPMC assumed WAMU's obligations under the Lease."). The court accordingly turned to the PAA to determine whether the lease at issue was for "Bank Premises" and found that it was. Unlike the properties in *290 at 71* and *Excel*, which were vacant lots, the land leased to WaMu by Skillman-Eastridge was the site of a "substantially completed" building over which WaMu had "possession and complete control" at the time of its failure. *Id*. at *7. Therefore, the court concluded, "the Lease was for Bank Premises, JPMC had the right to, and did elect not to assume it[, so] . . . Plaintiff is not in privity with JPMC, and does not have standing to enforce the Lease against it." *Id.*

DISCUSSION

A.     *Hillside's Standing to Rely on an Interpretation of the PAA*

    1.     *The Legal Standard*

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004). A party without standing cannot make out a "case or controversy" between himself and the defendant within the meaning of Article III of the Constitution and therefore cannot invoke the jurisdiction of a federal court. *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) ("As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). As stated by the Supreme Court in *Lujan v. Defenders of Wildlife*, in order to establish constitutional standing, a plaintiff must satisfy three elements:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560-61 (1992) (internal quotation marks, citations, and alterations omitted). "Apart from this minimum constitutional mandate, [the Supreme Court] has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers." *Warth*, 422 U.S. at 499. For instance, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, [the Supreme Court] has held that the plaintiff

11

generally must assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id*. at 499.

A plaintiff asserting standing has the burden of proving by a preponderance of the evidence that it exists. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Furthermore, "[a] plaintiff's burden to demonstrate standing increases over the course of litigation"; at the summary judgment stage, a plaintiff must provide evidence in support of specific facts which establish its standing. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Lujan*, 504 U.S. at 561; *Lujan v. Nat'l Wildlife Fed'n* ("*Lujan I*"), 496 U.S. 871, 907 n.8 (1990)). However, to establish standing, a plaintiff need only show that he has an arguable claim of right, not that he will prevail on the merits of his claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("'[J]urisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.'" (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946) (alterations omitted))). Applying the Supreme Court's language in *Steel Co. v. Citizens for a Better Environment* to this case, "the district court has jurisdiction if the right of the [plaintiff] to recover under [its] complaint will be sustained if the [relevant contracts] are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 89 (internal quotation marks omitted).[8]

---

[8] Accordingly, I disagree with the court in *GECCMC* that "the substantive dispute regarding the nature of the leases would be a foregone conclusion" if the court were "to hold that Plaintiff has standing to interpret and enforce the PAA." *GECCMC* at 12. This reasoning conflates the standing and merits inquiries. I also do not follow the lead of the Northern, Southern and Western Districts of Texas in holding that the plaintiff's standing turns on whether the lease was or was not assumed by Chase under the PAA. *See Cent. Sw. Tex. Dev.*; *290 at 71*, 2009 WL 3784347; *Excel Willowbrook*; *SR Partners Highway 26*; *SR Partners Hulen*, 2011 WL 2923971; *Skillman-Eastridge*, 2011 WL 4528391.

In order to establish standing at this stage of the litigation, Hillside must present evidence showing that it has a colorable claim of right to recover for an injury resulting from Chase's invasion of Hillside's own legally cognizable interest.

2.     *Application of the Legal Standard*

Hillside has alleged a concrete, particularized and actual injury.  It claims it has been deprived of rent and the other benefits of the Hillside lease.  It has also alleged a straightforward causal connection between the alleged injury and Chase's actions – Chase has failed to abide by the obligations originally assumed by WaMu as a party to the Hillside lease, which were transferred to the FDIC by order of the Office of Thrift Supervision and then, on the same day, to Chase by the PAA.  The alleged injury would be remedied by an order of the Court compelling Chase to comply with the lease obligations or to otherwise compensate Hillside for its losses.  The only disputed aspect of Hillside's standing is whether Hillside has a legally protected interest in Chase's fulfillment of the lease obligations.

According to Hillside, Chase became responsible for fulfilling the lease obligations when it assumed the lease pursuant to the PAA.  Chase and the FDIC dispute that Chase assumed the lease, but they do not contest that, if the lease was assumed, Chase is obligated to perform WaMu's obligations, and Hillside has a legally protected interest in Chase's performance.  Under New York law, "[w]here a lessee assigns his whole [lease interest], without reserving any reversion therein in himself, a privity of estate is at once created between his assignee and the original lessor, and the latter has a right of action, directly against the assignee, on the covenant to pay rent, or any other covenant in the lease which runs with the land." *Stewart v. Long Island R.R.*, 102 N.Y. 601, 607 (1886); *see also 78th St. & Broadway Co. v. Purssell Mfg. Co.*, 152 N.Y.S. 52, 53 (1st Dep't 1915) ("When an assignee accepts an

assignment of a lease of real property, he thereupon, by virtue of the assignment, becomes liable to the lessor for the rent stipulated to be paid."); *Tate v. Neary*, 65 N.Y. S. 40, 42 (4th Dep't 1900) ("A person who has accepted a valid assignment from the lessee, although he has not taken possession of the premises, becomes liable for rent subsequently accruing, and for breaches committed subsequently to the assignment of such of the lessee's covenants as run with the land." (quotation marks omitted)).[9]  For well over a century, this rule has been considered "so

---

[9]  Because the PAA contains a choice of law provision stipulating that the agreement "shall be governed by and construed in accordance with the federal law of the United States of America" (PAA § 13.4), Chase and the FDIC assert that the PAA must be read in accordance with federal common law. However, Hillside's claim of privity is based on New York law. Even if the PAA's choice of law provision is given effect, federal common law would apply only to determine whether Chase assumed the lease. The effect of that assumption is not determined by the terms of the PAA, and the agreement's choice of law provision therefore has no bearing on that issue. Neither Chase nor the FDIC argues otherwise. Both Chase and the FDIC contend that federal law should be used to determine whether Hillside is a third-party beneficiary, but because I find Hillside has standing to pursue its claims on the basis of its alleged privity with Chase, I need not address its argument that it is a third-party beneficiary of the PAA.

Chase does suggest that Hillside should be barred from relying on the PAA in light of federal public policy established by FIRREA. According to Chase, "[a]llowing untold numbers of third parties to sue assuming banks (or the FDIC) to enforce the third parties' interpretations of PAAs would clearly run afoul of FIRREA's essential purpose of expeditiously and efficiently resolving failed financial institutions."  (Def.'s Mem. Supp. Summ. J. 19-20, May 24, 2011, ECF No. 31-2.)  Presumably, in Chase's view, the perceived risk of uncertainty would deter banks from contracting with the FDIC to assume another bank's assets with the speed and efficiency envisioned by FIRREA. To the extent that Chase argues New York assignment law should be displaced as a matter of federal common law, the argument is rejected. As discussed below, federal standing law and New York substantive law together limit the "untold numbers" of potential plaintiffs to those who can plausibly allege a claim of right emanating from the PAA. Chase does not point to anything in FIRREA itself that directs this court to set aside New York assignment law. FIRREA establishes a comprehensive and detailed statutory scheme for the resolution of a failed bank's assets and liabilities; "matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994). Furthermore, because "[t]he present litigation is purely between private parties and does not touch the rights and duties of the United States," *Bank of Am. Nat'l Trust & Savings Ass'n v. Parnell*, 352 U.S. 29, 33 (1956), it does not call for the application of federal common law, *see Miree v. DeKalb Cnty.*, 433 U.S. 25, 31 (1977).

Finally, Chase has not identified any "significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers*, 512 U.S. at 87 (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). Before a court can displace state law in favor of federal common law, "an actual, significant conflict between a federal interest and a state law must be 'specifically shown,' and not generally alleged." *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 127 (2d Cir. 1999) (quoting *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)); *see also O'Melveny & Myers*, 512 U.S. at 89 (warning of "the runaway tendencies of 'federal common law' untethered to a genuinely identifiable (as opposed to a judicially constructed) federal policy"). Chase has not explained why federal standing law, in combination with the New York law of assignments, is insufficient to place an assuming bank on notice of potential claimants like Hillside. In addition, the alternative federal rule that Chase urges would be inimical to the purposes of FIRREA. Chase suggests that the FDIC, as receiver, and an assuming bank in Chase's position should be able to defeat any claim of a third party that relies on an interpretation of an assumption agreement simply by asserting, after the fact, that the proposed interpretation was not intended by the contracting parties, regardless of the language used in the agreement. By throwing the obligations of the assuming bank into uncertainty and rendering them dependent on the *post hoc*

well settled that it is hardly necessary to do more than refer to [it]." *Stewart*, 102 N.Y. at 607;

*see also Walton v. Cronly's Adm'r*, 14 Wend. 63, 65 (N.Y. Sup. Ct. 1835) ("[W]here the lessee

makes an absolute assignment of the whole term, the assignee and his representatives are liable

upon all the covenants which run with the land; and that whether the assignee took the actual

possession of the premises or not.").  In addition, where an assignee has made an express

covenant to assume all provisions of a lease, he is directly liable to the lessor even for those

provisions of the lease that do not run with the land.  *See Gateway I Group, Inc. v. Park Ave.*

*Physicians, P.C.*, 877 N.Y.S.2d 95, 101 (2d Dep't 2009).

      Hillside has presented the PAA and the lease as evidence in support of its claim

that Chase assumed the lease and is obligated to fulfill WaMu's obligations.  While Hillside's

interpretation of the PAA ultimately may not prevail, it is not "wholly insubstantial and

frivolous."[10]  *Steel Co.*, 523 U.S. at 89.  Accordingly, Hillside has standing to assert its claim and

is entitled to an opportunity to prove its allegations.  Chase and the FDIC disagree, but they fail

to analyze Hillside's claim in light of the standards laid out above.  Instead, they observe that

Hillside's allegations concern a contract to which it is not a party, conclusorily assert that

Hillside is not an intended third-party beneficiary of the contract, and recite a "rule" that a

plaintiff who is neither a party to nor a third-party beneficiary of a contract lacks standing to

enforce the contract.   Chase and the FDIC are correct that non-parties usually lack standing to

enforce contracts, but they do not examine the principles underlying this general observation, its

contours or its limitations.  Under general contract law principles, a contract typically vests only

---

assertions of the bank and the FDIC, such a rule would frustrate FIRREA's goal of "preserv[ing] the going concern value of the failed bank and avoid[ing] an interruption in banking services." *Langley v. FDIC*, 484 U.S. 86, 91 (1987) (internal quotation marks omitted).  Accordingly, I apply New York state law in the absence of a compelling reason to set it aside in favor of judicially-created rules of decision.

[10]    As discussed above, at least three district courts have adopted Hillside's reading in five cases presenting similar factual circumstances.

its signatories with rights, and non-parties usually have no substantive interest in seeing the contract enforced. *See Williams v. Eggleston*, 170 U.S. 304, 309 (1898) ("The parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it, and of all claims under it, a third party has no right to insist that it has been broken."); 17A Am. Jur. 2d *Contracts* § 416 ("Ordinarily, the obligations arising out of a contract are due only to those with whom it is made . . . ."). Where a non-party plaintiff claims to have suffered an injury due to a defendant's breach of a contractual duty owed to someone else, the plaintiff lacks standing to complain of the breach because his injury did not result from "an invasion of a legally protected interest" belonging to the plaintiff himself. *Lujan*, 504 U.S. at 560.

However, where the law arguably grants a plaintiff an interest in seeing another's contractual obligations performed, that plaintiff has standing to argue that he had such an interest and that the interest was violated, even though he is not a party to the contract. Thus, where a plaintiff plausibly claims to be an intended third-party beneficiary, he has standing to bring a breach of contract claim, because contract law vests intended third-party beneficiaries with contractual rights. Similarly, a plaintiff has standing to pursue a claim against a defendant who breached a contract with another where the defendant's breach allegedly also violated an independent duty owed the plaintiff. In such a case, the plaintiff's lack of standing to assert a breach of contract claim would not defeat his standing to assert a claim based in tort or property law. *See Glanzer v. Shepard* ("*Glanzer I*"), 186 N.Y.S. 88, 89 (1st Dep't 1921) ("It is true as a general rule, where the duty violated by the defendant was created solely by contract, that a cause of action arising out of such violation is limited strictly to the parties to the contract and those in privity with them. No privity of contract is necessary, however, to sustain an action in

tort by an individual specially injured by an act or omission constituting a breach of contract where it also constitutes an invasion of a legal right of, or the violation of a legal duty owed to, the plaintiff independently of or concurrently with the contract."), *aff'd*, ("*Glanzer II*"), 233 N.Y. 236 (1922). The key inquiry in each of these circumstances is whether the plaintiff has plausibly alleged an invasion by the defendant of his own legally protected interest. Hillside has satisfied that standard.

Hillside and the FDIC misconstrue Hillside's claim as a simple breach of contract claim. Hillside's claim is based primarily in property law, even though it relies in large part on the construction of the PAA. *See Glanzer II*, 233 N.Y. at 239 ("We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law[.]"). Hillside seeks to enforce not the PAA, but rather the lease it entered into with WaMu, which it plausibly alleges Chase assumed.

Under Chase and the FDIC's reasoning, a landlord would lose his ability to enforce a lease against an assignee merely on the representation of the assignee that no assignment had taken place. This is incompatible with longstanding property law, which allows a landlord to rely upon a contract to which he is not a party to establish an assignment. *See, e.g.*, *Burnett v. Irving Trust Co.* (*In re Radio-Keith-Orpheum Corp.*), 91 F.2d 1004, 1006 (2d Cir. 1937) ("[T]he only direct promise to the claimant to pay rent to him ran from . . . the original lessee. However, although its assignee . . . did not covenant to pay rent, it was bound to do so by privity of estate and so liable to the claimant for the rent . . . ."); *see also Cent. Sw. Tex. Dev.* at 9-10 ("Chase and the FDIC's position is also illogical under settled landlord-tenant

jurisprudence.").[11]  I adhere to the principle established by the Supreme Court in *Steel Co.*, and

find that Hillside has standing to pursue its claim because it has advanced a plausible reading of

the PAA that would place it in privity with Chase under New York law.  *See Steel Co.*, 523 U.S.

at 89.

B.     *Whether the Lease Is for "Bank Premises"*

The parties agree that the merits of the case turn on whether the lease was for

"Bank Premises."  As defined in the PAA,

> "Bank Premises" means the banking houses, drive-in banking
> facilities, and teller facilities (staffed or automated) together with
> appurtenant parking, storage and service facilities and structures
> connecting remote facilities to banking houses, and land on which
> the foregoing are located, that are owned or leased by the Failed
> Bank and that are occupied by the Failed Bank as of Bank Closing.

(PAA art. I.)  It is undisputed that the "Failed Bank" is WaMu, "Bank Closing" is close of

business on September 25, 2008, and WaMU had leased the Hillside property as of that date.

The parties differ over whether the property constitutes land on which a "banking house" was

located and whether WaMu "occupied" the property as of September 25, 2008.  If the answer to

either inquiry is "no," then the lease is not for Bank Premises, and Chase assumed it.  Both

parties have advanced arguments based on untenable interpretations of the contract, and, perhaps

---

[11]     In *Firestone*, the Central District of California adopted a limited version of the theory advanced by
Chase and the FDIC.  It held that plaintiff could not argue Chase had assumed a lease where Chase maintained it had
not and its reading of the PAA was "plausible."  *Firestone* at 8 ("Given that JPMorgan can assert a plausible reading
of the PAA whereby the parties to the PAA agree on JPMorgan's interpretation, this Court does not see any
inequitable 'catch-22' in applying the general rule that a third party cannot enforce the covenants in a contract unless
it is an intended beneficiary.").  Even so limited, the principle advanced by Chase and the FDIC is incompatible with
New York law, which holds that "[n]o particular words are necessary to effect an assignment; it is only required that
there be a perfected transaction between the assignor and assignee, intended by those parties to vest the assignee a
present right in the things assigned."  *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994); *see also Frank v. Erie & G.V.R.
Co.*, 122 N.Y. 197, 214 (1890)  ("As the lease . . . embraced all that [the original lessee] had acquired from his
lessor, it operated as an assignment in fact, although not such in form, of the entire term granted by the original
lease."); *Stewart*, 102 N.Y. at 612 ("The features of the instrument [purportedly assigning an interest to the
defendant] . . . would be proper subjects of consideration for the purpose of determining whether the relation of
landlord and tenant was created as between the original lessee and his lessee . . . ."); *Moore v. Chase*, 55 N.Y.S. 621,
623 (N.Y. App. Term. 1899) (liability to landlord established by a "reasonable inference . . . of acceptance by [the
assignee] of the lease").

for this reason, insufficient evidence has been presented to determine as a matter of law whether the lease was for Bank Premises. Accordingly, both motions for summary judgment are denied.

1.     *Legal Standard for Rule 56 Motions*

A motion for summary judgment pursuant to Fed. R. Civ. P. 56 should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over such a fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks omitted). The court may not make credibility determinations or weigh the evidence, and "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

2.     *Principles of Contract Interpretation*[12]

To determine the correct meaning of the PAA, I must look to the intent of the parties to the contract, Chase and the FDIC. *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.") "The best evidence of what the parties to a written agreement intend is what they say in their writing." *Id.* (internal quotation marks omitted); *see*

---

[12]     As discussed above, *see supra* note 9, Chase and the FDIC argue that the PAA should be construed in accordance with federal common law. Neither has shown a conflict between New York principles of contract interpretation and a federal policy. In fact, Chase concedes that there is no apparent conflict between New York and federal law in this respect, and that the court may therefore apply the former. (Def.'s Opp. Pl.'s Mot. Summ. J. at 5, May 23, 2011, ECF No. 33.)

*also Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 757 N.Y.S.2d 174, 176 (4th Dep't 2003) ("When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract . . . ." (quotation omitted)). Thus, where the language of the PAA is unambiguous on its face, it must be enforced according to the plain meaning of its terms.[13] *Greenfield*, 98 N.Y.2d at 569; *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[C]lear, complete writings should generally be enforced according to their terms . . . ."). Resort to parol evidence is appropriate only where the agreement is ambiguous. *Greenfield*, 97 N.Y.2d at 596. An agreement is ambiguous only if it is reasonably subject to more than one interpretation. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) ("Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978) (alteration in original)). "Ambiguity is determined by looking within the four corners of the document," *id.* (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)), and a party cannot create ambiguity "merely by urging different interpretations in the litigation," *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) (internal quotation marks and alterations omitted). Whether the PAA's terms are ambiguous is a question of law. *Van Wagner Adv. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191 (1986). To ascertain whether the parties' intent is "complete, clear and unambiguous on its face," *Greenfield*, 98 N.Y.2d at 569, I must consider the contract as a whole, give effect

---

[13] Thus, to the extent the language of the contract is clear, I may not consider testimony by representatives of the FDIC or of Chase that the parties to the PAA intended the definition of "Bank Premises" to encompass the Hillside property. (*See* Decl. Robert C. Schoppe ¶ 6 ("The lease agreement between WaMu and Hillside Metro Associates . . . was the type of lease that the FDIC considers to be Bank Premises within the meaning of those terms as set out in the Purchase and Assumption Agreement.")) Furthermore, even where parol evidence is appropriate, I cannot consider this statement when deciding Chase's motion for summary judgment, as it is not evidence the jury would be required to believe. *See Reeves*, 530 U.S. at 151.

and meaning to every term, and attempt to harmonize all of its terms, *Village of Hamburg v. Am. Ref-Fuel Co. of Niagara, LP*, 727 N.Y.S.2d 843, 846 (4th Dep't 2001) (citations omitted), *lv. to appeal denied*, 97 N.Y.2d 603.[14]

3.     *Whether a Banking House or Other Banking Facilities Were Located on the Property as of September 25, 2008*

Chase argues that the lease was for Bank Premises because "the entire purpose of the lease was for WaMu to operate a retail banking house" (Def.'s Mem. Supp. Summ. J. at 21), but the argument ignores the clear language of the PAA. Bank Premises include "banking houses, drive-in banking facilities, and teller facilities . . . , and land on which the foregoing are located." (PAA art. I.) Accordingly, in order for land to qualify as Bank Premises, there must be a banking house, drive-in banking facilities, and/or teller facilities located upon it. *Excel Willowbrook* at 10-11 ("If there are no 'foregoing' structures by that date, then the land, by itself, does not satisfy the definition."). Hillside's interpretation is also too extreme. A banking house need not be fully completed and operational to qualify under the definition of Bank Premises. For instance, a building constructed to be a bank that has not yet been painted or that is without lighting fixtures would unquestionably qualify as a banking house under the ordinary meaning of the term. *Skillman-Eastridge* at *6 ("While a vacant lot or even a slab of concrete with one wall constructed is not a completed banking house, a structure six days from issuance of a Certificate of Occupancy is a banking house under the PAA."). The parties have insisted on their extreme interpretations of the contract, and thus neither has advanced a workable definition of "banking houses, drive-in banking facilities, [or] teller facilities." (PAA art. I.) Reasonable people might disagree as to the precise state of completion that would satisfy these terms, and no parol

---

[14]     I note that no court construing the definition of Bank Premises has found the clause ambiguous as applied to the real estate at issue in the case before it.

evidence has been offered to help determine the line Chase and the FDIC intended to draw between a construction site on the one hand and a bank on the other.

In addition, there is virtually no evidence as to the state of the structure on the Hillside property as of September 25, 2008. The parties agree that on that date, the property was neither an empty plot of land nor the location of an operational bank. The record reflects that a building was located on the property, and that WaMu intended to convert the building into a bank branch. The lease between Hillside and WaMu contemplates extensive renovations to the building in order to effect the conversion. Hillside's counsel estimated at oral argument that the transformation was seventy or eighty percent complete as of September 25, 2008. Aside from that inadmissible representation, the record contains no indication of the structure's condition. Accordingly, it cannot be determined as a matter of law whether a banking house was located on the property on September 25, 2008 within the meaning of the PAA. Based on the summary judgment record, a reasonable factfinder would not be compelled to find that the structure was too far from completion to qualify as a banking house. Conversely, Chase has not established that Hillside will be unable to convince a reasonable factfinder that it was. *See Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case").

4.  *Whether WaMu Occupied the Property as of September 25, 2008*

Both Hillside and Chase insist that the meaning of the word "occupied" is unambiguous, but they offer competing interpretations. According to Hillside, for the property to qualify as Bank Premises, WaMu must have operated the "banking houses, drive-in banking facilities, and teller facilities" as such on September 25, 2008. Chase argues that to "occupy" the

property means simply to hold, possess, and keep it for use as a bank branch. Chase suggests that WaMu did not need to physically possess the premises, but only to possess the legal right to enjoy them to the exclusion of others. Chase's interpretation is untenable as a matter of law. When viewed in the context of the entire document, "occupy" clearly means more than simply to hold as lessee. Within the definition of Bank Premises itself, the phrase "that are occupied" would be stripped of independent meaning if it was coextensive with "that are owned or leased," as the definition requires the premises to have been owned or leased *and* occupied. (*See* PAA art. I.) *See Niagara Frontier Transp. Auth.*, 757 N.Y.S.2d at 176 ("Effect and meaning must be given to every term of the contract . . . ." (quoting *Village of Hamburg*, 727 N.Y.S.2d at 846)). In addition, § 4.6 of the PAA indicates that "to occupy" means more than to have the right to use. Under that section, Chase may occupy any leased Bank Premises for up to 180 days without exercising its right to assume the lease. (PAA § 4.6(f).) In such circumstance, the FDIC would continue in Hillside's place as the lessee, but Chase would be the occupant. Section 4.6 stipulates that if Chase continues its occupancy of any Bank Premises for longer than 180 days, it will be deemed to have assumed the lease to those premises. (*Id.*) This section makes clear that there must be some gap between an occupant and one with the right to possess.

On the other hand, the interpretation urged by Hillside – that to be in occupancy of the premises, WaMu must have been physically on the property, operating the structure as a bank on the very day of bank closing – is also untenable. A similar construction of the word "occupy" as used in a sublease was rejected by the Appellate Division, First Department, as a matter of law in *Woods v. Broder*, 113 N.Y.S. 335 (1st Dep't 1908). The plaintiff in *Woods* sublet a theater to two individuals, who promised to "pay all the rents due or that may become due . . . while they are in the occupation of said premises." *Id.* at 336. Defendants served as

guarantors of the sublease, guaranteeing to pay the rent "[i]f at any time during the term of said [sub]lease the [sublessees] will be in occupation of said premises and shall fail to pay the rent." *Id.* The plaintiff sued the defendants to recover an unpaid rent installment. *Id.* The defendants argued that, in order to recover, the plaintiff needed to show that the sublessees "were in actual physical occupation on the day that the rent fell due." *Id.* The Appellate Division rejected this argument, holding that it would "violate a cardinal maxim for the construction of contracts . . . , that they shall be so construed as to be made to operate rather than to be inefficient." *Id.* Under the definition urged by Hillside, a banking house in full operation on Saturday and Monday would qualify as Bank Premises, but would cease to be so on the Sunday in between, when the bank closed for the day. Similarly, a fully operative banking house that closed for several days for refurbishment would cease to be Bank Premises during the period of renovations, however brief. To demand that WaMu have operated the premises as a banking house on the very day the bank closed would render the definition unworkable and arbitrary. Moreover, Hillside's attempt to read into the PAA a requirement that WaMu have been operating the banking houses and other facilities at all finds no support in the document. The definition of Bank Premises does not require WaMu to have occupied the premises in any particular capacity. *See Red Ball Interior*, 173 F.3d at 484 ("[C]ourts must take care not . . . to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.").

As a matter of law, the true meaning of "occupy" lies somewhere between the definitions offered by the parties. Section 4.6 of the PAA provides elucidation. Section 4.6 grants Chase the option to assume a lease for Bank Premises only if it has "continuously occupied" the premises since WaMu's closing. (PAA § 4.6(a).) "[D]uring the period of any occupancy," Chase is obligated to reimburse the FDIC for any "operating costs . . . and to

24

comply with all relevant terms of [the lease], including . . . the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments." (PAA § 4.6(d)(i).) In the event that Chase "elects not to accept an assignment of the lease or sublease [of] any leased Bank Premises," and accordingly never becomes the lessee, Chase must end its occupancy by "vacating" the premises. (PAA §§ 4.6(c), 4.6(f).)

Accordingly, to "occupy" within the PAA means to comply with all obligations to pay rent and other operating costs including real estate taxes, insurance and other costs. *Cf. Waters v. New York Property Ins. Underwriting Ass'n*, No. 117343/03, 2005 WL 2934833, at *2 (N.Y. Sup. Ct. Sept. 29, 2005) (unpublished table opinion) ("The term 'owner occupied' requires actually using the Cottage, and reasonable people would agree that turning off water, gas, and telephone service is inconsistent with 'owner occupied.'"). It also includes an element of physical occupancy. This is clearly indicated by § 4.6, which calls for Chase to vacate the premises at the end of its occupancy. However, as discussed above, WaMu's agents need not have been physically on the premises on September 25, 2008, and they need not have been using the facility to conduct bank business. Rather, they must have generally maintained a physical presence on the property, perhaps advancing the bank's construction or preparing for its opening. *Cf. Sharp v. Stavisky*, 633 N.Y.S.2d 488, 489-90 (1st Dep't 1995) (when the word "occupy" was "viewed within the context of the entire document" it "plainly called for [the individual] to be in physical occupancy at least some portion of each year").

Again, the record contains insufficient evidence bearing on whether the property was so occupied by WaMu as of September 25, 2008.[15] The Hillside lease required WaMu to

---

[15] Robert Corroon, an agent of Hillside, stated in an affidavit that as of September 25, 2008, "there were no completed banking houses, drive-in banking facilities, or teller facilities (staffed or automated) on the Property and there were no such structures that were occupied by WAMU on September 25, 2008." (Decl. Robert Corroon ¶7.) Similarly, Chase's motion is supported by the conclusory affirmation of its agent Gregg Vogel that

25

pay for all "costs, expenses and obligations of every kind and nature whatsoever with respect to the Land and/or building," including real estate taxes, utilities and insurance premiums. (Lease §§ 2.02, 3.01, 3.04, 5.01.) But there is no evidence as to whether WaMu was in fact paying these costs as of September 25, 2008. Nor does the record suggest one way or the other whether WaMu had established a physical presence on the property as of that date. Accordingly, Hillside has not established as a matter of law that WaMu did not occupy the premises. On the other hand, it is impossible to conclude based on the record before me and the arguments presented by both parties that Hillside will be unable to establish WaMu's non-occupancy to the satisfaction of a reasonable factfinder.

C.     *Whether Any Assumption of the Lease by Chase Would Be Void*

The FDIC argues that the question of whether the Hillside property is "Bank Premises" is moot, because even if Chase did purport to assume the lease pursuant to the PAA, the assumption is void, and Hillside cannot recover on the lease. The FDIC relies on 12 U.S.C. § 29, which permits a national banking association, such as Chase, to "purchase, hold, and convey real estate for the following purposes, and for no others:"

> First. Such as shall be necessary for its accommodation in the transaction of its business.
> Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.
> Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.
> Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it.

---

"[o]n September 25, 2008, WaMu . . . occupied the property." (Decl. Gregg Vogel ¶ 8.) A jury would not be required to accept either version of events even if they adequately addressed the question of occupation of the premises.

12 U.S.C. § 29.   The FDIC contends that Chase has never intended to use the Hillside property

as a bank branch, or for any of the other purposes enumerated in § 29.   Accordingly, the

argument continues, any assumption of the lease by Chase would be void, and Hillside could not

hold Chase liable on its terms.   *See De La Vergne Refrigerating Mach. Co. v. German Savings*

*Inst.*, 175 U.S. 40, 59 (1899) (where a corporation enters *ultra vires* into a lease, "it has been

uniformly held that there could be no recovery upon the lease itself, though there might be in an

action for use and occupation of the property").

        The FDIC relies on *Houston v. Drake*, 97 F.2d 863 (9th Cir. 1938), in which the

Ninth Circuit held that a landlord could not recover on a lease that had been assumed by a bank

in violation of § 29.   *See id.* at 867 ("As the lease is void because ultra vires of the [assuming

bank], there can be no recovery on the lease by [the landlord], and the decree must declare the

lease to be void.").   In *Houston*, the lease had originally been between the landlord and the

Arizona National Bank of Tuscon ("Arizona National").   *Id.* at 864.   At some point during the

life of the lease, Arizona National transferred most of its assets to Consolidated National Bank

("Consolidated"), and Consolidated assumed all of Arizona National's obligations and liabilities.

*Id.*   However, the lease was not among the assets so transferred.   *Id.*   Rather, at the time of this

transfer, Consolidated was given an option to take over the lease at issue.   *Id.*   A few months

later, Consolidated assumed the lease pursuant to an agreement between it, Arizona National,

and the landlord.   *Id.*   Consolidated later defaulted, and the landlord sought to recover amounts

due under the lease.   Based on the evidence in the record, the Ninth Circuit found that at the time

Consolidated assumed the lease, it did not intend to use the premises in the transaction of its

business, but instead acquired the lease "because it was considered 'good business' and because

it was thought that a profit could be made by sub-leasing the premises."   *Id*. at 865.   Because

Consolidated therefore acted outside the authority conferred by § 29 in assuming the lease, *id*., the court found the lease to be void and concluded that there could be no recovery on the lease by the landlord, *id.* at 867.

The Ninth Circuit distinguished its holding in *Drake* in a case three years later, *Frank v. Giesy*, 117 F.2d 122 (9th Cir. 1941). In that case, a national bank rented premises on which it conducted banking business. *Id.* at 123. That bank eventually consolidated with another bank to form the American National Bank ("American National"), which, as a result of the consolidation, assumed the lease at issue, along with the predecessor bank's other assets. *Id*. However, after the consolidation, the leased premises ceased to be used as bank quarters. *Id.* Several years later, the Comptroller of the Currency directed that American National dispose of the lease. *Id.* American National accordingly assigned the lease to some its affiliates, but agreed to remain liable under the lease. *Id.* About a year after the assignment of the lease, the assignees abandoned the premises and ceased paying the rent, taxes and insurance premiums as required under the lease, and the landlords sued American National and the assignees to recover the amounts due. *Id.* at 124. The Ninth Circuit considered, and rejected, an argument by the shareholders of American National that the landlord could not recover upon the lease because "American National's assumption of liability under the lease when the bank had no intention of using the property for banking quarters, and its guaranty of the payment of rentals upon its assignment of the lease, were ultra vires." *Id*. at 125. The court reasoned that prior to the time of the consolidation, the lease was a valid obligation pursuant to 12 U.S.C. § 29. It reasoned further that "the lease did not become ultra vires simply because the lessee, upon its consolidation with another bank, no longer occupied the leased premises." *Id*. The *Frank* court distinguished *Houston* based on the nature of the banks' consolidation: in *Frank*, the assets and liabilities of

one bank were vested in their entirety in another bank. Accordingly, the court held that the landlord was entitled to recover all rents, taxes and insurance premiums that had accrued under the terms of the lease.

*Frank* stands for the proposition that a third party may seek recourse from a bank that has assumed the valid obligation of another bank pursuant to a wholesale assumption of assets and liabilities, even where the assuming bank could not have undertaken the obligation initially. This principle governs the present case. The parties agree that if Chase assumed the lease, it did so as part of its automatic acquisition of virtually all of WaMu's assets under the PAA, and not under a separate agreement pertaining only to the Hillside premises. Chase emphasizes that the purpose of the transaction was "to preserve the going concern value of the failed bank" (Def.'s Mem. Supp. Summ. J. at 4 (quoting *Langley*, 484 U.S. at 91 (internal quotation marks omitted))), and the FDIC states that it was "[t]o ensure a seamless transition" (FDIC Mem. Supp. Mot. Dismiss at 2, May 24, 2011, ECF No. 30-11). Accordingly, I find that the transaction effected by the PAA was similar to the merger in *Frank*, as a result of which American National stepped into its predecessor's shoes with respect to all assets and liabilities, including the disputed lease. It is unlike the transaction in *Houston*, in which the acquiring bank assumed the disputed lease following negotiations with the landlord and original lessee concerning only that lease, and by doing so deliberately acquired an asset in violation of 12 U.S.C. § 29. Unlike the acquiring bank in *Houston*, Chase did not assume the lease for the purpose of speculating in real estate. *See First Nat'l Bank of Bellaire v. Comptroller of Currency*, 697 F.2d 674, 682 (5th Cir. 1983) ("The purpose of 12 U.S.C. § 29 is 'to keep the capital of the banks flowing in the daily channels of commerce; to deter [banks] from embarking in hazardous real-estate speculations; and to prevent the accumulation of large masses of such

property in their hands, to be held as it were, in mortmain.'" (quoting *Nat'l Bank v. Matthews*, 98 U.S. 621, 626 (1878))). Rather, according to Hillside's claim, as part of a much larger transaction, Chase automatically and on a wholesale basis assumed a lease that was held at all times by WaMu to be used as banking premises. By Chase's own account, it was unable to review each of the assets it assumed under § 3.1 of the PAA (*see* Def.'s Mem. Supp. Summ. J. at 5), and any decision not to use the Hillside property as banking premises must have been arrived at following a review subsequent to acquisition. Accordingly, assuming Chase automatically assumed the Hillside lease pursuant to the PAA, Chase may be under an obligation to divest itself of the property within a reasonable time, *see First Nat'l Bank of Bellaire*, 697 F.2d at 682 ("[W]hen the property . . . was no longer being held within the four permissible categories of 12 U.S.C. § 29[,] . . . [t]he Bank . . . was under a duty to divest itself of the property in a reasonable time."); 12 C.F.R. § 34.83(a)(3)(C)(ii) ("Should the [Comptroller of the Currency] determine that a bank has entered into a lease . . . in violation of 12 U.S.C. § 29 . . . , the [Comptroller] will take appropriate measures to address the violation, which may include requiring the bank to take immediate steps to divest the lease or sublease . . . ."); *id.* § 34.82 (setting out time frame within which bank should dispose of real estate no longer intended for future expansion), but the lease is not void, and Hillside may recover against Chase.

CONCLUSION

For the reasons stated above, the FDIC's motion to dismiss, Chase's motion for summary judgment, and Hillside's motion for summary judgment are denied. A trial will be held on January 17, 2012, at 9:30 AM. A final pretrial conference will be held on January 6, 2012, at 12:00 PM.

So ordered.


John Gleeson, U.S.D.J.

Dated: October 20, 2011
   Brooklyn, New York