UNITED STATES DISTRICT COURT        <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

HILLSIDE METRO ASSOCIATES, LLC,

               Plaintiff,               MEMORANDUM
                                              <u>AND ORDER</u>

      - against -

                                        10-CV-1772 (JG) (SMG)

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,

               Defendant.
-----------------------------------------------------------x

A P P E A R A N C E S :

        KASLING, HEMPHILL, DOLEZAL & ATWELL, LLP
                700 Lavaca Street, Suite 1000
                Austin, TX 78701
        By:    R. Kemp Kasling (admitted *pro hac vice*)
                       - *and* -
        DEWEY PEGNO & KRAMARSKY LLP
                777 Third Avenue
                New York, NY 10017
        By:    Thomas E. L. Dewey
                Adam Michael Smith
                *Attorneys for Plaintiff*

        MORGAN, LEWIS & BOCKIUS LLP
                101 Park Avenue
                New York, NY 10178
        By:    Heather Leigh Hopkins
                Kathleen MacFarlane Waters (admitted *pro hac vice*)
                *Attorneys for Defendants*

        CULLEN AND DYKMAN LLP
                100 Quentin Roosevelt Boulevard
                Garden City, NY 11530
        By:    Cynthia Ann Augello
                James G. Ryan
                *Attorneys for Intervenor FDIC*

JOHN GLEESON, United States District Judge:

This is the second round of summary judgment motions in this case.  In the first round, all motions were denied based on the insufficiency of the record.  *See* Memorandum and Order, *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 10-CV-1772 (JG) (SMG), 2011 WL 5008368 (E.D.N.Y. Oct. 20, 2011) (ECF No. 53) ("*Hillside I*").  The parties resumed discovery and here again cross-move for summary judgment based on a more developed factual record.

This opinion assumes familiarity with the facts and analysis laid out in *Hillside I*. In summary, this case involves a single claim for breach of contract by Hillside Metro Associates, LLC ("Hillside") against JPMorgan Chase Bank, National Association ("Chase"). Hillside's claim derives from a lease ("Hillside lease" or "lease") it originally entered into with Washington Mutual Bank ("WaMu").  After the lease was executed, WaMu was declared insolvent.  The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for WaMu and assumed all assets and liabilities of the failed bank.  The FDIC then entered into a contract with Chase that assigned in a wholesale fashion the bulk of WaMu's assets to Chase, with a few specified exceptions.

The key question addressed by these cross-motions for summary judgment is whether the Hillside lease was among those assets transferred to Chase by the FDIC.  If so, Chase is liable to Hillside for its tenant obligations under the lease, including rent payments.  If not, then both Chase and the FDIC lawfully repudiated the lease and Hillside has no remedy. The FDIC (which intervened in the case as the putative real party in interest) and Chase have jointly moved for summary judgment, asserting that, as a matter of law, Chase did not assume the lease; Hillside has cross-moved for summary judgment on the same issue, contending that the

2

lease was assumed.  For the reasons stated below, I conclude as a matter of law that Chase

assumed the lease from the FDIC and accordingly grant Hillside's motion for summary judgment

on the question of liability.  The motion for summary judgment filed jointly by the FDIC and

Chase is denied.

BACKGROUND

A.      *Facts*

On or about May 15, 2008,[1] Hillside and WaMu entered into the Hillside lease for

a piece of real property located at 216-20 Hillside Avenue in Queens, New York ("Hillside

property" or "property").  The lease provided that Hillside would lease the property to WaMu for

a period of ten years, with options for renewal and for early termination.  Defs.' 56.1 Stmt. ¶ 9

(ECF No. 65); Lease §§ 1.01, 35.01, 38.01 (Smith Dec., Ex. A, ECF No. 69-5).  At the time the

lease was executed, a 4,300-square-foot building already existed on the property.  Defs.' 56.1

Stmt. ¶ 17.  The building had been used as a Blockbuster Video store.  Pl.'s 56.1 Stmt. ¶ 17

(ECF No. 70).  The lease authorized WaMu to make extensive renovations to the property to

prepare it for use as a bank branch.  *Id.*; Defs.' 56.1 Stmt. ¶ 17; Lease § 6.01.  In particular, the

lease permitted WaMu to construct one or more automated teller machines; to build a drive-

through window; and to remove a portion of the rear of the building.  Lease § 6.01(b)(i).

Attached to the lease was a "Concept Plan" depicting a fully constructed, operational bank

branch.  *Id.* Ex. A.

---

[1]      Although the parties agree in their Rule 56.1 Statements that the lease was executed on April 30,
2008, *see* Defs.' 56.1 Stmt. ¶ 9; Pl.'s 56.1 Stmt. ¶ 9, sometimes the parties refer in their papers to the lease's having
been executed on May 15, 2008.  In the version of the lease filed by Hillside, the cover page of the lease is dated
April 30, 2008, while its signature pages indicate that it was signed by WaMu on April 29, 2008, and by Hillside on
May 15, 2008.  *See* Lease at 2, 53-54 (Smith Dec., Ex. A, ECF No. 69-5).  In the version of the lease filed by Chase
and the FDIC, the cover page has been altered to read May 15, 2008, while the signature pages are the same.  *See*
Lease at 1, 51-52 (Schoppe Dec., Ex. B, ECF No. 65-27).  None of these anomalies affects the outcome of the
motions before me.

On September 25, 2008, WaMu was declared insolvent and the FDIC was appointed to serve as WaMu's receiver.  Accordingly, as of that date, all of WaMu's assets and liabilities, including the lease, were taken over by the FDIC.  *See* 12 U.S.C. § 1821(c).

On the same day, the FDIC entered into a Purchase and Assumption Agreement ("PAA") with Chase.  *See* PAA (Smith Dec., Ex. G, ECF No. 69-11; Vogel Dec., Ex. A, ECF No. 65-30).  With certain specified exceptions, Section 3.1 of the PAA transferred to Chase "all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired)" of WaMu.  *Id.* § 3.1.

Section 3.5 of the PAA specified the exceptions to the wholesale asset transfer of Section 3.1, providing that Chase "does not purchase, acquire or assume . . . under this Agreement the assets or Assets[2] listed on the attached Schedule 3.5."  *Id.* § 3.5.  Among those assets listed in Schedule 3.5 as specifically exempted from the automatic transfer were "leased Bank Premises."  *Id.*, sched. 3.5.  The PAA defined "Bank Premises" as:

> the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and are occupied by the Failed Bank as of Bank Closing.

*Id.*, art. I.

Section 4.6 of the PAA gave Chase a 90-day option to accept or decline to accept assignment of "any or all leases for leased Bank Premises."  *Id.* § 4.6(a).[3]  Any lease that was not assumed by Chase within the 90 days would remain within the control of the FDIC as receiver.

---

[2]    The PAA defines "Assets" with a capital "A" to mean "all assets of the Failed Bank purchased pursuant to Section 3.1."  PAA, art. I.

[3]    Schedule 3.5 reinforced the existence of this option, providing in subsection (3) that "certain assets not purchased" included "leased Bank Premises . . . ; provided, that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto."  PAA, sched. 3.5(3).

Pursuant to 12 U.S.C. § 1821(e), the FDIC, within a reasonable period after its appointment as receiver for WaMu, could repudiate any lease to which WaMu was a party as long as it determined, within its discretion, that such lease was burdensome, and that its repudiation would promote the orderly administration of WaMu's affairs.

Both Chase and the FDIC purported to timely repudiate the Hillside lease.[4] However, on March 9, 2010, Hillside sent a letter to Chase in which it argued that Chase had automatically assumed the lease under the PAA § 3.1. Hillside declared Chase in default of the lease and demanded that Chase remedy the purported default within ten days.

B.    *Procedural History*

On April 21, 2010, Hillside commenced this action against Chase, seeking damages for breach, abandonment and/or repudiation of the lease plus attorneys' fees. Compl. (ECF No. 1). On July 7, 2010, the FDIC moved to intervene pursuant to Fed. R. Civ. P. 24 as the real party in interest; the unopposed motion was granted on July 12, 2010. (ECF No. 9.) On October 20, 2011, this court denied the first round of summary judgment motions in this case. *See Hillside I* (ECF No. 53). On March 19, 2012, the FDIC and Chase jointly filed the instant motion for summary judgment. (ECF No. 64.) On April 2, 2012, Hillside opposed the defendants' motion and cross-moved for summary judgment. (ECF No. 69.) Oral argument on the motions occurred on April 12, 2012.

---

[4]    Chase informed the FDIC in December 2008 that it did not wish to assume the lease, and Chase informed Hillside of the same by letter dated January 2, 2009. By letter dated April 19, 2009, the FDIC informed Hillside that it had decided to disaffirm the lease pursuant to its statutory authority. The letter stated that Hillside would be entitled under the lease and under 12 U.S.C. § 1821(e)(4) to all rent accruing before the date of the letter, and that the FDIC's obligations under the lease on behalf of WaMu would terminate as of that date.

DISCUSSION

A.   *Legal Standards*

A motion for summary judgment pursuant to Fed. R. Civ. P. 56 should be granted

only "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" within the

meaning of Rule 56 when its resolution "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over

such a fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Id.*  When applying this standard, the court must "resolve all ambiguities,

and credit all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment."  *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation

marks omitted).

The touchstone of my interpretation of the PAA is the intent of the parties to the

contract – here, Chase and the FDIC.  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569

(2002) ("The fundamental, neutral precept of contract interpretation is that agreements are

construed in accord with the parties' intent.").[5]  "The best evidence of what the parties to a

written agreement intend is what they say in their writing."  *Id.* (internal quotation marks

omitted); *see also Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 757 N.Y.S.2d 174, 176

(4th Dep't 2003) ("When interpreting a written contract, the court should give effect to the intent

---

[5]      I applied New York law to interpret the PAA in my previous opinion in this case, and the parties
here provide no reason why I should not do so again.  However, even if I were to apply federal common law, *see,
e.g.*, *GECCMC 2005-C1 Plummer Street Office Ltd. Partnership v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d
1027, 1033 (9th Cir. 2012) (holding that federal common law governs interpretation of the PAA), it would not affect
my analysis, because I interpret the PAA according to its unambiguous plain meaning, which is a universal precept
of contract interpretation.  *See* Restatement (Second) of Contracts § 202(3)(a) (2011).  Moreover, even if federal
common law governs the question of whether the lease was assigned under the PAA, New York law governs the
question of whether Chase and Hillside are in privity of estate as a result of that assignment.  *See Hillside I*, 2011
WL 5008368, at *6 n.9 ("Hillside's claim of privity is based in New York law.  Even if the PAA's choice of law
provision is given effect, federal common law would apply only to determine whether Chase assumed the lease.").

of the parties as revealed by the language and structure of the contract . . . ." (quotation

omitted)).  Thus, where the language of the PAA is unambiguous on its face, it must be enforced

according to the plain meaning of its terms.  *Greenfield*, 98 N.Y.2d at 569; *W.W.W. Assocs. v.

Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[C]lear, complete writings should generally be

enforced according to their terms . . . .").

B.      *Whether the Lease Is for "Bank Premises"*

The parties agree that the case turns on whether the lease was for "Bank

Premises."  As noted above, the PAA defines "Bank Premises" as:

> the banking houses, drive-in banking facilities, and teller facilities
> (staffed or automated) together with appurtenant parking, storage
> and service facilities and structures connecting remote facilities to
> banking houses, and land on which the foregoing are located, that
> are owned or leased by the Failed Bank and are occupied by the
> Failed Bank as of Bank Closing.

PAA, art. I.  It is undisputed that the "Failed Bank" is WaMu, "Bank Closing" is the close of

business on September 25, 2008, and WaMu had leased the Hillside property as of that date.

Therefore the parties' dispute boils down to whether the property contains a "banking house" and

whether WaMu "occupied" the property as of September 25, 2008.

The parties agree that if the property qualified as a "Bank Premises," then Chase

did not assume the lease, and the FDIC legally repudiated it, and therefore neither is liable to

Hillside.  On the other hand, the parties agree that if the property did *not* qualify as a "Bank

Premises," then Chase assumed the lease as part of the wholesale asset transfer provided for in

Section 3.1,[6] and Chase is liable to Hillside under the lease.

---

[6]      If the lease is not for "Bank Premises," then it falls in the category of "Other Real Estate," which
the PAA defines as "all interests in real estate (other than Bank Premises and Fixtures), including but not limited to
mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are
owned by the Failed Bank."  PAA, art. I.  The parties agree that if the property is "Other Real Estate," then Chase
assumed the lease as part of the wholesale asset transfer provided for in Section 3.1.

I am not writing on a blank slate here.  My analysis of the facts before me is strongly circumscribed and guided by my prior summary judgment opinion in this case, *Hillside I*.  In particular, although Chase and the FDIC repeatedly exhort me to find that *any* lease that WaMu entered into for the *purpose* of establishing a bank branch qualifies as a leased Bank Premises, my prior opinion already considered and rejected that construction of the PAA.  In *Hillside I*, I wrote:

> Chase argues that the lease was for Bank Premises because "the entire purpose of the lease was for WaMu to operate a retail banking house," but the argument ignores the clear language of the PAA.  Bank Premises include "banking houses, drive-in banking facilities, and teller facilities . . . , and land on which the foregoing are located."  Accordingly, in order for land to qualify as Bank Premises, there must be a banking house, drive-in banking facilities, and/or teller facilities located upon it.

*Hillside I*, 2011 WL 5008368, at *10 (internal citations omitted).

Nor am I alone in concluding that the unambiguous language of the PAA itself makes the characteristics of the physical structure present on the property relevant to the question of whether a lease is one for "Bank Premises," and that a mere intent to house a bank branch on the leased property in the future – however earnest the intent or detailed the plan – is not enough to convert that property into a Bank Premises.  In *290 at 71, L.L.C. v. JPMorgan Chase Bank*, No. A-09-CA-576-SS, 2009 WL 3784347 (W.D. Tex. Nov. 9, 2009), the district court held, when confronted with an exhibit showing an "architectural plan of what was proposed to be constructed on the land covered by the Lease":

> The Court wholly agrees with Mr. Mercer that had WAMU ever built all it proposed to build – including a banking house, drive-in banking facilities, and telling facilities – on the land, the Lease would no doubt be a Bank Premises lease.  But, because it is undisputed not an iota of what was planned was actually constructed, and none of the planned structures existed (much less

> were occupied by WAMU) on the day of the closing, his exhibit
> was irrelevant.

*Id.* at *5; *see also Skillman-Eastridge, Ltd. v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:09-CV-01988-M, 2011 WL 4528391, at *6 (N.D. Tex. Sept. 29, 2011) ("To determine if the property was 'Bank Premises' under the PAA, the Court must focus on: 1) *the characteristics of the physical structure on the lot as of September 25, 2008*; and 2) whether the structure was 'occupied' on that date." (emphasis added)); *SR Partners Hulen, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:10-CV-437-B, 2011 WL 2923971, at *8 (N.D. Tex. July 21, 2011) ("In order to qualify as 'Bank Premises' under the PAA, . . . 'one or more of the "foregoing" structures must be physically on the land, and WAMU must have physically occupied those facilities on the date of closing.'" (quoting Memorandum Opinion and Order at 11, *Excel Willowbrook, LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. H-09-2988 (S.D. Tex. July 11, 2011)[7]); *Weichsel Farm Ltd., Partnership v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 3:09-CV-00672-L, 2012 WL 1033514, at *8 (N.D. Tex. March 28, 2012) ("[A] proper reading of the PAA requires WaMu not only to have taken possession of the land, but also for at least one of the structures described in the PAA's definition of Bank Premises to be substantially completed when [WaMu] closed." (quoting *Skillman-Eastridge*, 2011 WL 4528391, at *7)).  Accordingly, merely executing a lease with the intent to use the property as a bank branch is not alone sufficient for the lease to qualify as one for Bank Premises under the PAA.[8]

The record evidences that despite WaMu's intention to convert 216-20 Hillside Avenue into a bank branch, as of September 25, 2008, no such conversion had yet taken place. The building on the lot remained a vacant Blockbuster Video store.  Hillside has provided the

---

[7]        The opinion in *Excel Willowbrook* is unpublished but is available on the docket of this case.  *See* Pl.'s 7/14/11 Notice Supplemental Auth. Ex. A (ECF No. 47-2).

[8]        Counsel for the FDIC informed me at oral argument that the FDIC has since changed the definition of "Bank Premises" in its standard PAA to expressly embrace this more comprehensive definition.

court with a photograph of the property taken around March 2009, which its managing agent

swears to be a fair and accurate representation of the property as of September 25, 2008.

Corroon Supp. Dec. ¶ 16 & Ex. B (ECF No. 69-1, 69-2).  The photograph shows a vacant

building with an awning that reads, "Blockbuster Video," on at least two sides.  *Id.*, Ex. B.

Lettering printed on the window promises, "We Deliver." *Id.*[9]  There is no evidence of any

construction, renovation, demolition, or alteration of the building structure since Blockbuster

Video vacated it.

   Chase and the FDIC's own description of the state of the property on September

25, 2008, is as follows:

> WaMu and/or its agents undertook certain actions to ready the
> property for opening as a bank branch.  These actions included: (1)
> hiring an architect to perform an inspection of the Leased Property;
> (2) initiating the process to obtain a building permit for the certain
> "Drive-Thru Renovations" described above, and seeking and
> receiving information from Plaintiff to assist with same; (3)
> obtaining a copy of the building plans for the Leased Property in
> order to assist its architect in preparing bank branch plans; (4)
> arranging for its contractors to meet with Plaintiff's agents in
> connection with its proposed construction work; (5) requesting an
> asbestos abatement certificate, which is required to be filed before
> obtaining a building permit and/or commencing any demolition;
> (6) causing its agent to transfer the utilitites in WaMu's name,
> where they remained during WaMu's occupancy; (7) causing
> insurance to be obtained on the Leased Premises; and (8)
> maintaining a physical presence on the property by running
> electrical heaters.

Defs.' Memo. at 5 (ECF No. 66); *see also* Defs.' 56.1 Stmt. ¶ 40.[10]

---

[9]   Although the photograph is in black-and-white, the FDIC and Chase admit that the Blockbuster
Video paint colors remained on the building as well.  *See* Defs.' Memo. at 9.

[10]   Hillside disputes many of these facts.  *See* Pl.'s 56.1 Stmt. ¶ 40.  However, I am not permitted to
resolve factual disputes in a summary judgment motion.  Therefore, for purposes of deciding Hillside's motion, I
accept the version of the facts advanced by Chase and the FDIC.  *See Heyman v. Commerce & Industry Ins. Co.*,
524 F.2d 1317, 1320 (2d Cir. 1975) ("[W]hen the court considers a motion for summary judgment, it must resolve
all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought .
. . ." (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam))).

It is apparent from this description that no construction, renovation, demolition, or other physical conversion of the property had yet begun.  The facts – as presented by Chase and the FDIC themselves – at most show a lease for an empty building structure plus an intent to convert it into bank house.  But, as laid out above, a mere intent to use the building as a bank branch – even a particularized intent supported with detailed architectural plans – is not enough to render the property a "Bank Premises," where not one iota of the detailed architectural plans was actually undertaken.  *See Skillman-Eastridge*, 2011 WL 4528391, at *5.

## CONCLUSION

Because I conclude that the Hillside lease did not constitute "leased Bank Premises," as of September 25, 2008, the lease was automatically assumed by Chase through Section 3.1 of the PAA.  Accordingly, Chase is liable under the lease to Hillside.[11]  The parties are encouraged to come to an agreement regarding the appropriate amount of damages and to apprise the court of the status of that effort on or before June 11, 2012.

---

[11]     Because I conclude that the Hillside property did not contain a banking house as of September 25, 2008, I need not decide whether WaMu "occupied" the property within the meaning of the PAA as of September 25, 2008.  I note that my prior opinion required an element of physical occupancy to satisfy the occupancy requirement, *see Hillside I*, 2011 WL 5008368, at *12, and I am dubious whether the presence of WaMu's space heaters on the property by April 2009 satisfies this requirement.  *See* Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Stmt. ¶ 40; Gillman 4/8/09 Email (Smith Dec., Ex. K, ECF No. 69-15).  However, I need not speculate on this question, because the definition of Bank Premises is in the conjunctive: it expressly requires both a banking structure *and* occupancy.

     The remaining arguments raised by the FDIC and Chase deserve only cursory mention.  First, they argue the lease was a liability, rather than an asset, and was not assumed through the PAA.  *See* Defs.' Memo. at 21-23.  This is wrong for two reasons.  First of all, the PAA clearly treats leases as assets, by specifically exempting leased Bank Premises in Schedule 3.5 from the wholesale asset transfer of Section 3.1.  And furthermore, even if the lease were a liability, the PAA transferred all of WaMu's liabilities to Chase in a wholesale fashion, as well.  *See* PAA § 2.1 ("[T]he Assuming Bank expressly assumes . . . and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing . . . ."); *see also id.*, sched. 2.1 (specifying "[c]ertain [l]iabilities [n]ot [a]ssumed," without mentioning leases).

     Second, the FDIC and Chase claim that this lawsuit was initiated by Hillside's managing agent without Hillside's authorization.  *See* Defs.' Memo. at 23-24.  Hillside has submitted sworn declarations from both Hillside's managing agent (Robert Corroon), and the trustee of a trust that is a member of Hillside (Richard Zirinsky) – the same person who signed the Hillside lease on behalf of Hillside.  *See* Corroon Supp. Dec. (ECF No. 69-1); Zirinsky Dec. (ECF No. 69-3); *see also* Lease at 53-54.  Both swear that Hillside authorized the lawsuit.  Accordingly, I find the contention that the lawsuit was unauthorized to be meritless.

So ordered.


John Gleeson, U.S.D.J.

Dated:  May 9, 2012
        Brooklyn, New York